**CASE NO. 23-1582(L)**

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

_____

JONG CHEON LEE,

*Plaintiff-Appellee,*

v.

AGAPE HEALTH MANAGEMENT, INC.;
DONG CHUL CHOI; SUN OK LEE,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA

_____

**OPENING BRIEF OF APPELLANTS**

_____

Phillip B. Leiser
LEISER LAW FIRM PLLC
1750 Tysons Boulevard
Suite 1500
Tysons Corner, VA 22102
703-734-5000
pbleiser@leiserlaw.com

*Counsel for Appellants/Cross-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _1582_          Caption: _Agape Health Management, Inc., Dong Chul Choi, Sun Ok Lee v. Lee_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Agape Health Management, Inc., Dong Chul Choi, Sun Ok Lee_
(name of party/amicus)

_____

 who is _____Appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)     ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Phillip B. Leiser, Esq.                    Date:        7/11/23

Counsel for: all Appellants

- 2 -

# Table of Contents

Page

Table of Authorities ................................................................. iii

I.     Jurisdictional Statement ................................................1

II.    Issues Presented for Review ..........................................2

III.   Statement of the Case  .................................................2

    A. *Lee v. Agape, et. al.* (1:22-cv-00311) and *Son, et. al. v. Agape, et. al.* (1:20-cv-01047) ................................................................2

    B. Procedural History ................................................5

IV.    Summary of Argument .................................................6

V.     Argument ...................................................................7

    A. Standard of Review ..................................................7

    B. The trial court was obligated to consider the *Barber* factors in determining an award of reasonable attorney's fees and costs .................8

    C. The trial court's stated rationale for its award of fees and costs did not address the *Barber* factors ............................................9

    D. The rationale, for the Supreme Court's decision in *Goldberg v. Kelly*, imposed upon the trial court, the requirement that it articulate the legal and factual bases for its decision ...............................11

        1. The *Matthews* balancing test compels the conclusion that the principles enunciated in *Goldberg* should apply to every decision, of a judicial nature, that is dispositive of a litigant's rights ...................................................................13

            (a) The private interests affected by dispositive judicial rulings are substantial ................................................14

i

(b) The risk of an erroneous judicial deprivation of such property interest through use of the current procedure is high, as is the probable value of additional or substitute procedural safeguards—specifically, imposing the *Goldberg* rule on trial courts and their judges ...............................15

(c) The governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail, is negligible ........................................................................................18

E. In determining the *quantum* of attorney's fees and costs to award Plaintiffs' counsel, the trial court abused its discretion by failing to adequately consider the *Barber* factors enunciated above ..................22

1. The novelty and difficulty of the questions raised ..............................22

2. The skill required to properly perform the legal services rendered ............................................................................................24

3. The experience, reputation and ability of Mr. Ryu and his staff ........24

4. The time and labor expended ...........................................................25

(a) Entire categories of billed time cannot be evaluated for reasonableness due to inadequate descriptions of the time spent, and must therefore be disregarded.......................................28

(b) Many time entries, even in legitimately billed categories of activities, were inadequately described, and therefore must be disregarded .................................................................................29

(c) Much of the time spent, on activities that were legitimately billable, was excessive ...............................................................31

(d) Duplicative time entries .................................................................37

VI.  Conclusion .......................................................................................49

Certificate of Compliance .......................................................................50

## Table of Authorities

### Cases

*Barber v. Kimbrell's,*
577 F.2d 216 (4th Cir. 1978) ................................................................ 8

*Burnley v. Short,*
730 F.2d 136 (4th Cir. 1984) ................................................................ 7

*Cooter & Gell v. Hartmarx Corp.,*
496 U.S. 384 (1990) ............................................................................ 7

*District of Columbia v. Feldman,*
460 U.S. 462 (1983) .......................................................................... 21

*Goldberg v. Kelly,*
397 U.S. 254 (1970) ..................................................................... 11, 12

*Grissom v. Mills Corp.,*
549 F.3d 313 (4th Cir. 2008) ................................................................ 8

*Hensley v. Eckerhart,*
461 U.S. 424 (1983) .......................................................................... 28

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
341 U.S. 123 (1951) .......................................................................... 17

*Koon v. United States,*
518 U.S. 81 (1996) .............................................................................. 7

*Mathews v. Eldridge,*
424 U.S. 319 (1976) .......................................................................... 13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983) ................................................................................ 7

*Printz v. United States,*
521 U.S. 898 (1997) .......................................................................... 21

*Will v. Calvert Fire Insurance Co.,*
437 U.S. 655 (1978) ...................................................................... 7, 10

## Statutes

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 ........................................................................................ 1

29 U.S.C. § 201 .......................................................................................... 1

29 U.S.C. § 216 .......................................................................................... 7

Va. Code Ann. § 8.01-380 ........................................................................ 44

## Constitution

U.S. Const. amend. V ............................................................................ 6, 11

## I.    Jurisdictional Statement

This is an appeal of two separate final orders entered by the United States District Court for the Eastern District of Virginia (Alexandria Division) ("the trial court") on 4/28/23, awarding attorney's fees, court costs, and litigation-related expenses ("fees and costs") to Appellees/Plaintiffs-below, all of whom are former employees of Appellants/Defendants-below.  All of the Plaintiffs' claims arose under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. 201, *et. seq.* ("FLSA").  The first order (**JA1120**) awarded $30,000 in fees and $584.90 in costs against Appellants/Defendants-below, AGAPE HEALTH MANAGEMENT, INC., DONG CHUL CHOI, and SUN OK LEE (collectively, "AGAPE"), and in favor of the Appellee/Plaintiff-below, JONG CHEON LEE ("LEE").  The second order (**JA965**) awarded $350,000 in attorney's fees and $39,047.18 in costs to Appellees/Plaintiffs below (collectively, "Employees"), pursuant to their consolidated FLSA unpaid overtime wage claims.

The trial court exercised subject matter jurisdiction ("SMJ") over the action pursuant to its "federal question" jurisdiction, 28 U.S.C. § 1331.  Pursuant to the appellate jurisdiction conferred by 28 U.S.C. § 1291, this Court may exercise SMJ over this appeal of the two 4/28/23 final orders which disposed of all of Plaintiffs'/Appellees' remaining claims.  Appellants timely filed their Notices of Appeal ("NoA") of both orders on 5/26/23.  (**JA1003** and **JA1122**).

1

## II.    Issues Presented for Review

The issue presented for review by this Court is whether the trial court abused its discretion in awarding Plaintiffs' counsel, Mr. Ryu, $380,000 in attorney's fees and nearly $40,000 in costs, related to his prosecution of their FLSA claims against AGAPE, who contends the trial court's awards constituted an abuse of discretion, as a matter of law, because they were unaccompanied by sufficiently clear explanations concerning the legal and factual bases for those awards and the reasonableness thereof.  In addition, assuming, *arguendo*, the legal sufficiency of the trial court's explanations for its decisions, the trial court nevertheless abused its discretion by awarding fees related to activities that were superfluous, excessive, duplicative, unnecessary, or unrelated to successful claims.

## III.    Statement of the Case

### A. *Lee v. Agape, et. al.* (1:22-cv-00311) and *Son, et. al. v. Agape, et. al.* (1:20-cv-01047)

On 3/22/22, Appellant/Plaintiff-below, JONG CHEON LEE, filed a complaint against AGAPE, asserting a cause of action arising under the FLSA.  **(JA1007)**. After conducting some discovery, the parties ultimately settled the underlying wage and overtime dispute, reserving the issue of an award of attorney's fees and costs.  After the 4/28/23 hearing, the trial court entered an order awarding Lee $30,000 in attorney's fees and $584.90 in costs.  **(JA1120)**.

2

On 9/8/20 three employees filed a complaint against AGAPE alleging violations of the FLSA, in failing to properly pay them overtime wages for hours worked in excess of 40 each week. **(JA56)** A fourth employee was added, by consent, on 11/12/20 (**JA86**), and on 3/3/23, the trial court ordered the continuation of the consolidation of three other pending FLSA cases against AGAPE, for the purpose of adjudicating the attorney's fee petition. The prior consolidation had resulted in a total of ten plaintiffs.

Following the consolidation of those FLSA lawsuits against AGAPE, and after the completion of discovery, and the adjudication of cross-motions for summary judgment, the ten plaintiffs ultimately settled the underlying dispute, which written settlement agreements were approved by the trial court **(JA24-27) (Dkt. # 256-265)**. As a material condition of those settlement agreements, they were to be filed under seal, to maintain the privacy of each of the plaintiffs.

The parties reserved for adjudication by the trial court, the issue of an award of reasonable attorney's fees and costs. Employees filed their fee petition,[1] AGAPE filed its opposition,[2] and Employees filed their reply.[3] After conducting a hearing

---

[1] **JA271, JA293, JA550, JA552, JA573, JA593, JA608, JA645**
[2] **JA704, JA730, JA740, JA742**
[3] **JA752, JA783, JA785, JA944, JA945, JA949, JA951, JA961, JA963**

on 4/28/23 **(JA967)**, the trial court entered an order awarding Employees an aggregate of $350,000 in attorney's fees and $39,047.18 in costs. **(JA965)**.

In total, between the two underlying cases on appeal (by AGAPE) before this Court, there were 11 Employees who were awarded an aggregate of $380,000 in fees and nearly $40,000 in costs—averaging out to about $34,500 in fees and $3,600 in costs per employee.

Mr. Ryu—the only Virginia-licensed attorney who worked on the case—recorded 1,351.95 billable  hours ("BH"), at an average hourly rate of $488.69.[4] Mr. Ryu's paralegals billed a total of 201.6 hours at an average rate of $177.37. Mr. Ryu's wife, Sara Ryu, who is not a licensed attorney in Virginia, billed 62.8 hours at an average hourly rate of $428.61—a rate that is more than double what a paralegal with substantial experience should charge.

Besides billing at excessive rates—particularly, Sara Ryu, and despite the legal and factual commonality among the Employees' claims; the early consolidation of their underlying lawsuits; and the lack of complexity to the underlying legal and factual issues; the total number of hours invested by Mr. Ryu and his employees

---

[4] In August 2020, when Mr. Ryu first began working on the case, he billed at the hourly rate of $430.  Four months later he raised his rate to $480.  One year later, he raised his rate yet again, to $510, and about a year after that, he raised it to $560.  Thus, in 2.5 years, Mr. Ryu gave himself raises totaling more than 30% above his starting hourly rate—more than 10% per year, during a period in which there was not only a global pandemic but also a global recession.

was 1,616.35 hours—an average of 147 hours per employee, or the equivalent of an average of *eighteen* 8-hour days per plaintiff-employee.  That is, 18 full work-days, or 3.6 work-weeks were spent per plaintiff in the garden-variety, multi-plaintiff FLSA litigation that preceded this appeal.

As explained more fully below, Mr. Ryu's billing statement, filed in support of his fee petitions **(JA785)** reflect entire categories of time entries that are not billable (such as internal communications between Mr. Ryu and his paralegals), entries that are duplicative, and entries with insufficiently detailed descriptions of the tasks performed.  Moreover, there were a number of claims and motions that were unnecessary and unsuccessful, including, *inter alia*, Mr. Ryu's filing of a counterclaim to a counterclaim, a motion for injunctive relief/restraining order against AGAPE, several retaliation complaints, and an unsuccessful motion for summary judgment ("MFSJ").  Indeed, the first three of those pleadings were dead on arrival and should never have been filed.

**B.  Procedural History**

As to the issue on appeal—the reasonableness of the trial court's award of attorney's fees and costs, the relevant procedural history is uncomplicated.  After several former employees of Agape filed separate FLSA lawsuits, the trial court consolidated the matters for pre-trial proceedings.  Ultimately the parties settled

the underlying wage dispute, reserving the issue of attorney's fees and costs for adjudication by the trial court.

Prior to settlement, the parties litigated a number of motions, including cross-motions for summary judgment, discovery motions, etc. In addition, Employees filed several retaliation complaints. For the purpose of documenting the procedural history of this case, those matters are not particularly relevant. However, they will be addressed in the context of the reasonableness of the fees and costs associated therewith, that was ultimately awarded by the trial court.

### IV.    Summary of Argument

Although the award of fees and costs was lower than what Employees had requested, the trial court did not provide a sufficient explanation for its decision, and thereby deprived AGAPE of the meaningful opportunity to be heard, guaranteed by the procedural due process clause of the 5th Amendment to the U.S. Constitution, which provides that "no person shall be deprived of his . . . property without due process of law." U.S. Const. Amend V. As such, the trial court's decision constitutes an abuse of discretion, as a matter of law, requiring a remand for further proceedings consistent herewith. Moreover, the trial court abused its discretion by failing to properly weigh the relevant factors in assessing an appropriate award of fees and costs.

## V. Argument

### A. Standard of Review

The trial court's determination of the award of attorney's fees and costs in favor of Employees is subject to an abuse of discretion standard of review. "The payment of attorney's fees to employees prevailing in FLSA cases is mandatory. 29 U.S.C. § 216(b). The amount of the attorney's fees, however, is within the sound discretion of the trial court." *Burnley v. Short*, 730 F.2d 136, 141 (4th Cir. 1984) (internal citations omitted).

An abuse of discretion occurs when a district court bases "its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions. *Koon v. United States*, 518 U.S. 81, 100 (1996). A district court abuses its discretion "if it fails or refuses to exercise discretion and instead decides by general rule or arbitrarily." *Will v. Calvert Fire Insurance Co.,* 437 U.S. 655, 661–62 (1978). Similarly, a district court abuses its discretion if it fails to adequately consider the factors constraining its exercise of discretion. *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 19 (1983). Finally, a district court abuses its discretion if its decision is based on erroneous legal or factual premises. *See Cooter & Gell* at 496 U.S. 384, 401–02.

Since the parties to this case settled the underlying wage dispute, as a technical matter, there was no "prevailing party." Nevertheless, the parties agreed to submit the issue of an appropriate award of attorney's fees and costs to the trial court for its adjudication.

## B. The trial court was obligated to consider the *Barber* factors in determining an award of reasonable attorney's fees and costs

In calculating an award of attorney's fees, the trial court must determine the lodestar amount, defined as a "reasonable hourly rate multiplied by hours reasonably expended." *Grissom v. The Mills Corp.*, 549 F.3d 313, 320-21 (4th Cir. 2008). As this Court has held,

> The court's assessment of reasonableness involves consideration of the following factors: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978).

The second step in the analysis requires the Court to subtract from the lodestar amount, those fees incurred on unsuccessful claims unrelated to successful claims.

8

Finally, the third step requires the Court to evaluate the degree of success of the

plaintiffs and to reduce the overall fees, accordingly.  **(JA970:4-20)**.

### C. The trial court's stated rationale for its award of fees and costs did not address the *Barber* factors

The orders awarding fees and costs **(JA965, JA1120)** are devoid of any

explanation for the trial court's decision, but instead refer to the transcript of the

4/28/23 hearing, on the issue of an award of fees and costs.  But the transcript

**(JA967)** is also devoid of a sufficient articulation of the reasoning behind the

court's decision.  The court accepted Mr. Ryu's lodestar number (the number of

hours expended multiplied by his requested (and ever-increasing) billable rates.  It

also accepted, without analysis, Mr. Ryu's modest reduction in his total fees, based

on his assessment—rather than the court's independent assessment—of

unsuccessful claims.  **(JA996:12-13, JA997:10-12)**.  It then focused on the third

*Barber* factor—the degree of success of the plaintiffs.  The trial court's explanation

for its ultimate award—$350,000 and $30,000 in fees, respectively, for -01047 and

-00311—was limited to the following:

> The real issue here is Step 3 and what kind of a reduction
> comes at Step 3 so that the ultimate number, the ultimate
> level of attorneys' fees are fair, and are reasonable, and
> incorporates all the different considerations that all the
> parties have raised.  And I have considered all the parties'
> arguments.  I have considered all the issues raised.  I do
> think—I do think that . . . this is a tremendous amount of
> money.  I hope you're not disappointed, Mr. Ryu, but for
> me this is an enormous amount of money.  I think the math

9

> that I do is—I think, generally speaking, $30,000 per plaintiff is a reasonable figure, and then when you add on top of that the– I think some of the unique characteristics of this case and . . . some of the unique issues that pertain to this case, . . . in [-01047] . . . I will award attorneys' fees in the amount of $350,000 . . . .
>
> . . . [I]n [-00311], I think that—again, . . . I'm accepting [Mr. Ryu's] . . . lodestar number of $34,772.  When I go through Step 2 and Step 3, I'm going to reduce that to a straight $30,000 . . . .  Again, I think that is an amount that is fair [and] reasonable.  I think it reflects all the hard work that you did, Mr. Ryu.  I think it reflects . . . all the factors that we cited earlier that the Court . . . has to consider and take into account.  **(JA996:12-997:20)**.

Although the trial court referenced the "math" it had done, it never disclosed its own calculations.  And although the trial court indicated it believed its decision reflected its consideration of all the relevant factors, it failed to articulate how it had done so.  Instead, it appeared to assign an arbitrary fee award for each Employee, governed by a general rule, in contravention of the Supreme Court's admonition in *Calvert Fire Insurance Co.,* 437 U.S. 655, 661–62.  As such, the trial court's explanation does not pass constitutional muster, because it failed to articulate a reasoned explanation for its decision.  It simply stated its conclusion— the final numbers for fees awarded in each case, without explaining, either conceptually or mathematically, how it arrived at those calculations.

10

**D. The rationale, for the Supreme Court's decision in *Goldberg v. Kelly*, imposed upon the trial court, the requirement that it articulate the legal and factual bases for its decision**

The Fifth Amendment to the U.S. Constitution prohibits the governmental deprivation of a person's property, without due process of law, which is commonly defined as notice and a *meaningful* opportunity to be heard.  A meaningful opportunity to be heard requires the decision-maker—in this case, the trial court—to articulate the legal and factual bases for its decision that is dispositive of a litigant's rights.

In *Goldberg v. Kelly*, 397 U.S. 254 (1970), SCOTUS' seminal due process decision, the High Court held that due process must include affording a property owner a *meaningful* opportunity to be heard, before the government may terminate his property right.  And in order to make a hearing "meaningful," the decision-maker must articulate the legal and factual bases for a decision that deprives a person of his property.  *Goldberg* at 397 U.S. 254, 267-68.  The *Goldberg* court explained,

> . . . the possibility for honest error or irritable misjudgment [is] too great, to allow [deprivation of the property right at issue in *Goldberg*] without giving the recipient a chance, if he so desires, to be fully informed of the case against him so that he may contest its basis and produce evidence in rebuttal.  *Id. at* 266.
> . . .
> Finally, the decisionmaker's conclusion [as to whether the property right at issue in *Goldberg* should be extinguished] must rest solely on the legal rules and

11

> evidence adduced at the hearing. . . . *To demonstrate*
> *compliance with this elementary requirement, the*
> *decisionmaker should state the reasons for his*
> *determination and indicate the evidence he relied on*, . . .
> *Id.* at 271.  (emphasis added).

The *Goldberg* court recognized that termination of a property interest "involves . . . action that adjudicates important rights," and based its procedural due process requirements enunciated there on the extent to which the property owner who was wrongfully deprived of his property would be "condemned to suffer grievous loss." *Id.* at 262-63.  To determine the mandatory procedural requirements for a contemplated governmental deprivation hearing, the *Goldberg* court established a balancing test between the "recipient's interest in avoiding that loss" versus "the governmental interest in summary adjudication." *Id.*  Accordingly, it held,

> . . . [C]onsideration of what procedures due process may
> require under any given set of circumstances must begin
> with a determination of the precise nature of the
> governmental function involved, as well as of the private
> interest that has been affected by governmental action. *Id.*
> at 263.

*Goldberg* stands for the principle that those whose property rights have been extinguished by our government, through proceedings of a judicial nature, are entitled to more than a metaphorical echo chamber in which to be heard.  Judges who decline to articulate the legal and factual bases for their decisions fail to *demonstrate* compliance with the due process dictates of *Goldberg*.  And it is only through their *demonstrated* compliance with those dictates, that judges provide

12

litigants with the "meaningful opportunity to be heard" that is so fundamental to the concept of due process of law.

1. **The *Matthews* balancing test compels the conclusion that the principles enunciated in *Goldberg* should apply to every decision, of a judicial nature, that is dispositive of a litigant's rights**

The *Goldberg* decision must be understood in light of *Matthews v. Eldridge,* 424 U.S. 319 (1976), which further clarified the contours of procedural due process. Both cases arose in the context of state administrative agency decisions to terminate certain state-created property rights—in *Goldberg*, welfare benefits; in *Matthews*, social security disability benefits. *Matthews* recognized "the truism that 'due process,' . . . is not a technical conception with a fixed content unrelated to time, place and circumstances," *Id.* at 334, and emphasized, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* To determine the specific dictates of due process the government must afford in a particular situation, *Matthews* refined the *Goldberg* balancing test, clarifying the three factors that must be balanced:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Id.* at 335.

13

### (a) The private interests affected by dispositive judicial rulings are substantial

The private interests affected by official judicial action in civil lawsuits are as multifarious as the universe of legitimate subjects of tort and contract litigation. But in order for a court to distinguish, for due process purposes, the property interest at issue in *Goldberg*—welfare benefits, from those at issue in civil litigation, it would have to come up with a fairly nuanced argument to explain, for example, that government-funded welfare benefits are private interests of great consequence, and therefore subject to the *Goldberg* requirements, but the right of an injured pedestrian, rendered a quadriplegic by the gross negligence of a drunk driver, to recover, through court proceedings, compensation from that negligent driver and/or his insurer, for past and future medical bills, lost income, and pain and suffering, is substantially less significant, so as not to warrant the same due process protections mandated by *Goldberg*.  For the purpose of assessing the level of constitutional protection they warrant, the private interests at stake in civil litigation are often significant enough so as not to be meaningfully distinguishable from the private interests at issue in *Goldberg*.  In this case, at issue is hundreds of thousands of dollars in claimed legal fees—an amount that is, by just about any measure, significant.

**(b)** **The risk of an erroneous judicial deprivation of such property interest through use of the current procedure is high, as is the probable value of additional or substitute procedural safeguards—specifically, imposing the *Goldberg* rule on trial courts and their judges**

The mere availability of appellate review, which itself comes at significant additional cost—both pecuniary and temporal—to the litigants involved, does not obviate the need to cure the constitutional defect inherent in inadequately explained judicial rulings at the trial court level. Too frequently, judges who are dis-inclined to do the arduous work of ascertaining the governing law and correctly applying it to the facts in the record, substitute their personal opinions for well-reasoned judicial decisions, thereby creating a results-oriented justice system that too often substitutes the personal whim of individual judges for the steady application of the rule of law that lends consistency and predictability to, and commands respect for, our justice system.

The current procedure—or, more accurately, the absence thereof—is fundamentally flawed, because by default, the determination of the process that is due is left up to the unfettered discretion of individual judges, some of whom are scrupulous about explaining the bases for all of their rulings; while others are not. But when judges decline to explain their dispositive rulings, it is generally because they can't—at least not by any coherent legal argument. And so, under the *status quo*, litigants whose property rights in their claims have been extinguished by the

15

government, through its dispositive judicial rulings, are too often never informed of the reason(s) why their government deprived them of their property. That is not acceptable.

Dispositive rulings that are not adequately explained by the judges who issue them breed cynicism toward and mistrust of judges; generate suspicion about potential ulterior motives for those decisions; and erode confidence in the integrity of our justice system. Dispositive rulings effectively issued as silent edicts handed down from on high, are not respected by litigants, their counsel, or the public. Nobody trusts rulings, unaccompanied, as they too often are, by explanations for their legal and factual underpinnings. Nobody ever has; nobody ever will; and nobody ever should.

Due process requires application of uniform procedures in a particular context. And it is only the consistent application of the *Goldberg* rule that will keep judges intellectually honest and judicially disciplined, for, as Justice Louis Brandeis wisely observed, "Sunlight is the best disinfectant; electric light, the most efficient policeman." A justice system that demands faithful adherence to the *Goldberg* rule sends a powerful message that the People will trust judicial decisionmakers when, but *only* when, those decisionmakers *demonstrate*, through their strict compliance with the *Goldberg* due process dictates, that they have respected the rights of those litigants. And a justice system that insists those vested with judicial power explain

the rationale for their dispositive rulings will thereby maximize the likelihood that

the law will be applied even-handedly and consistently—indispensable attributes

of a justice system that commands the respect of the People.

It is the duty and obligation of a judge to justify his decision by articulating his

rationale therefor.  Only then has that litigant been afforded the meaningful

opportunity to be heard that is such a critical component of due process of law.  As

expressed by SCOTUS,

> An "appropriate" governmental "determination" must be
> the result of a process of reasoning.  It cannot be an
> arbitrary fiat contrary to the known facts.  This is inherent
> in the meaning of "determination."  It is implicit in a
> government of laws and not of men . . . . *Joint Anti-Fascist
> Refugee Committee v. McGrath*, 341 U.S. 123, 136 (1951).

It is noteworthy that in any civil tort or contract case, members of the public,

not to mention the litigants themselves, can freely access the court's file containing

the evidentiary exhibits pertaining to a particular legal controversy.  And they are

free to attend court hearings and listen to the testimony of litigants and their

witnesses, the arguments of counsel, and the court's issuance of bench rulings.

Thus, the facts of a particular dispute that have been developed in the record are

within the public domain.  Likewise, the law governing those facts is within the

public domain, available for review at any law library, in any courthouse.  And

finally, the pleadings arguing, and the orders adjudicating particular legal issues in

controversy are also available for public scrutiny.  Thus, besides the facts of a

particular dispute and the governing law, the parties' competing arguments and the judicial decisions that have *supposedly* considered those arguments, and applied the law to the facts, are also within the public domain.

But if the facts of a particular dispute, the law governing those facts, and the ultimate judicial decision applying the law to those facts, are all within the public domain, why is the thought process and legal reasoning that applies the governing law to those facts *not* within the public domain? Such incongruity between the ready access of the public and the litigants—the very people whose property rights are being adjudicated—to the former, and the lack of transparency with which courts often guard the latter, has nothing to do with protecting the due process rights of litigants.

In conclusion, this second factor in the *Matthews* balancing test, the risk of an erroneous deprivation of such property interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards, weighs heavily in favor of applying the *Goldberg* rule to dispositive judicial decisions.

### (c) The governmental interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail, is negligible

Any projected increase in congestion of court dockets, and the resulting drain on the public fisc that could ensue, from imposing on judges the requirement that they take the time to explain their dispositive rulings, is imaginary. First, the time-

18

consuming portion of that obligation consists in properly deciding the legal issue, by correctly ascertaining and applying the governing law to the material facts developed in the record. But, presumably, judges are required to perform that task, even absent the *Goldberg* requirements. By contrast, requiring a judge to articulate the rationale for a decision already formulated in his mind imposes little additional time or effort.

Second, any *de minimus* additional time invested by judges to explain their dispositive rulings is an investment that pays handsome dividends, for, rulings that are explained are generally understood and accepted, because often, they are correct. And as a consequence, judicial explanations for dispositive rulings minimize unnecessary, unmeritorious, and ultimately, unsuccessful motions for reconsideration and appeals.

In those instances in which judicial explanations fail to persuade a litigant at the losing end of a dispositive ruling, well-reasoned explanations can serve to streamline appellate arguments, thereby conserving the resources of the appellate courts, by eliminating "shotgun approach" appeals from litigants and their counsel, who have been left dumb-founded by dispositive rulings unaccompanied by adequate explanations, and which, for that reason, seem to require a regurgitation on appeal of every legal argument raised in the trial court in opposition to those rulings. Instead, motions for reconsideration and appeals, filed in response to

dispositive rulings that are accompanied by judicial explanations, tend to be more sharply focused on legitimately contested legal issues, thereby *conserving* judicial time at both the trial and appellate levels, and consequently, imposing less demand on the public fisc.

The proof of the pudding is in the eating. Any concern that imposing the *Goldberg* due process requirements on judges issuing dispositive rulings, will result in fiscal or administrative burdens that outweigh the clear benefits outlined above is belied by experience. Judges who have honestly and carefully thought through the reasons for their dispositive rulings, do not have much difficulty in succinctly articulating them. The extra time involved has not had any appreciable impact on their ability to efficiently manage their dockets.

In addition, fewer frivolous and more sharply focused appeals will actually *conserve* the appellate courts' time and resources. Therefore, this third factor in the balancing test, assessing the burdens that will likely be imposed on the government by the proposed procedure, also weighs in favor of imposing the *Goldberg* rule on decisions of a judicial nature. In conclusion, consideration of the three factors enunciated in the *Matthews* balancing test inexorably leads to the conclusion that the *Goldberg* due process dictates apply with equal force to judicial decisions, at both the trial and appellate levels, requiring judges to articulate the

legal and factual bases for their dispositive rulings—not simply short-circuiting

due process by providing only their ultimate conclusions.[5]

It is the *nature* of the decision itself—judicial, as opposed to legislative or

executive—that serves as the line of demarcation between decisions requiring a

reasoned explanation and those that do not, for that is the only distinction that

provides any coherence to the *Goldberg* decision. Thus, judges, like their

administrative agency counterparts, are bound by the *Goldberg* rule whenever they

make dispositive rulings that deprive a litigant of his property.

---

[5] Although *Goldberg* and *Matthews* arose in the context of administrative agency decisions, the *Goldberg* due process requirements are not limited to decisions of administrative agencies. The *Goldberg* requirements apply to any decision *of a judicial nature*—that is, decisions that "investigate, declare, and enforce 'liabilities as they stand  on present or past facts and under laws supposed already to exist[,]'" *District of Columbia v. Feldman*, 460 U.S. 462, 479 (1983). Nor should the distinction be made between administrative agency decisions and court decisions of a judicial nature, based upon the nature of the decision-maker. Such a distinction has been rejected by SCOTUS. "Distinguishing among officers on the basis of their title rather than the function they perform is 'empty formalistic reasoning of the highest order.'" *Printz v. U.S.*, 521 U.S. 898, 929, fn. 14 (1997). The *Goldberg* court painted with a much broader brush—as one would expect when SCOTUS issues an opinion—applying its rationale to *all* decision-makers engaged in decisions *of a judicial nature*, regardless of either their job-title or the branch of government that employs them. As the *Feldman* court emphasized, "the form of the proceedings is not significant. It is the nature and effect which is controlling[,]" *Id.* at 460 U.S. 462, 482. It reiterated that, "the nature of a proceeding 'depends not upon the character of the body but upon the character of the proceedings.'" *Feldman* at 460 U.S. 462, 477.

**E. In determining the *quantum* of attorney's fees and costs to award Plaintiffs' counsel, the trial court abused its discretion by failing to adequately consider the *Barber* factors enunciated above**

Assuming, *arguendo*, the constitutional sufficiency of the trial court's explanation for its decision, it nevertheless abused its discretion by failing to adequately consider the *Barber* factors.

**1. The novelty and difficulty of the questions raised**

At the outset, it is important to recognize the inherent lack of complexity in most FLSA cases, including the cases at bar. FLSA plaintiffs bear the burden of establishing their agreed-upon hourly rates of pay. In addition, an FLSA plaintiff must prove he worked in excess of forty hours in a particular week, thereby entitling him to overtime pay, which is calculated very simply, by multiplying his regular rate of pay by 1.5, and then multiplying that product by the number of over-time hours (those in excess of 40) worked during a particular week. Finally, the sum of those overtime calculations must be determined for each pay-period for each plaintiff, and the result multiplied by two, to account for statutorily permissible liquidated damages.

Also contributing, to the relative simplicity of the issues raised by Employees' complaints, is the fact that, although, ultimately, these FLSA lawsuits involved eleven individual plaintiffs, there was only a single corporate defendant and two individual defendants—owners of that small corporation. The owners

22

were the principal decision-makers and were directly involved with supervising the plaintiff-employees. Although there were other employees, there were no "middle managers."

After obtaining and reviewing each plaintiff's paystubs, and with the assistance of a basic calculator, the determination of the damages for each plaintiff involves a very straightforward calculation, requiring math skills no more advanced than those acquired in the 6th grade, if not earlier. All that is needed is to know how to multiply, divide, add, and subtract. The inherent simplicity of a typical FLSA case is reflected by the complaint drafted by Mr. Ryu on behalf of the original three plaintiffs in (-01047). A review of that Complaint **(JA56)** reveals a straight-forward eight page pleading, containing one count, alleging violation of the FLSA. In view of the very specific *ad damnum* clauses for each plaintiff—$59,063.33, $26,442.00, and $37,900.20, respectively, it must be inferred that those three plaintiffs provided proof of their hours worked and rates of pay. Obviously, there were calculations unique to each of those plaintiffs, based upon their respective hourly rates and the numbers of hours of overtime each worked. But the calculations for each of those three initial plaintiffs should have been very straightforward, as two of them maintained the same rate of pay throughout the duration of their employment with AGAPE, while the third received a raise after the first year of employment.

23

### 2. The skill required to properly perform the legal services rendered

Because the legal and factual issues presented in the typical FLSA case—including the ones at bar—are straightforward, there are no particularly high-level skills necessary to competently represent FLSA plaintiffs, particularly, as here, when there is no dispute concerning whether the employees are exempt.

### 3. The experience, reputation and ability of Mr. Ryu and his staff

According to his fee petition **(JA289)**, Mr. Ryu has been practicing law since 2004—sixteen years when the case commenced on 9/8/20, with the filing of the complaint, and nineteen years as of 4/28/23, when the final order was entered awarding Plaintiffs attorney's fees and costs, thereby effectively concluding the case.

In light of the inherent non-complexity of the typical FLSA cases, such as those at bar, the skill required to properly perform the legal services rendered were minimal. And particularly, in light of the experience level of Mr. Ryu and his staff, and their prior experience working as a team on FLSA cases, the amount of time billed was incredibly out of proportion to the needs of the case. In (-01047) Mr. Ryu and his staff billed a total of $755,841 in fees. **(JA937)**. In (-00311) Mr. Ryu and his staff billed a total of $34,772 in fees. **(JA1043)**. The total fees generated by Mr. Ryu and his staff in these consolidated cases was close to $800,000. As explained in detail, i*nfra.*, these run-of-the-mill FLSA cases, which

24

were consolidated early on, could have—and therefore should have—been litigated much more efficiently.

### 4. The time and labor expended

Consider the following chart indicating the hours billed in (-01047).

| | **Michael Ryu** | | | **Sara Ryu** | |
|---|---|---|---|---|---|
| **BR**[6] | **HRS (#)** | **Fees** | **BR** | **HRS (#)** | **Fees** |
| $240 | 1.0 | $240 | $420 | 51.9 | $21,798 |
| $430 | 27.2 | $11,696 | $460 | 8.8 | $ 4,048 |
| $480 | 969.15 | $465,192 | $510 | 2.1 | $1,071 |
| $510 | 300.3 | $153,153 | | | |
| $560 | 54.3 | $30,408 | | | |
| **Sub-Total** | **1,351.95** | **$660,689** | | **62.8** | **$26,917** |

| | **PLG** | | | | |
|---|---|---|---|---|---|
| **BR** | **HRS (#)** | **Fees** | | | |
| $150 | 17.7 | $2,655 | | | |
| $180 | 183.9 | $33,102 | | | |
| **Sub-Total** | **201.6** | **$35,757** | | | |
| **TOTAL** | | | | **1,616.35** | **$723,363**[7] |

---

[6] Billable Rate. Mr. Ryu's average billable rate ("ABR") was $488.69. Note the ABR x BH expended for each time-keeper ("TK") does not match the subtotal of fees for that TK, due to rounding errors. The figures in the "Fees" column are the actual fees accrued. Ms. Ryu's ABR was $428.61 and the Paralegal ("PLG") ABR was $177.37.

[7] For some inexplicable reason, the corresponding total as stated by Mr. Ryu is $755,841 (**JA937, JA973:17, JA974:1, 8-11**).

Consider the following overview of Mr. Ryu's attorney's fees generated in these cases. His billing entries fall into the following broad categories:

**Calculate Fees:** Calculating attorney's fees and costs accrued by Plaintiffs

**Calculate Wages:** Calculating unpaid overtime wages for ten plaintiffs

**Client Contact:** includes in-person and telephone conferences, correspondence (including emails) with or from any of the ten plaintiffs in -01047

**Correspondence:** includes drafting and reading emails and letters, telephone calls with opposing counsel, the court, non-plaintiff witnesses, vendors (such as court reporters), etc.[8]

**Court Hearings:** self-explanatory.

**Depositions:** self-explanatory

**Depo./Hearing Prep./Debriefings a/k/a Depo. Prep.:** relatively self-explanatory

**Doc. Drafting:** includes drafting of legal pleadings and forms that are filed with the court. This category does not include correspondence with clients, opposing counsel, vendors, the courts, etc.

**Doc. Review:** includes review of legal pleadings and transcripts but not correspondence

**Doc. Filing:** e-filing pleading, exhibits, forms, and other docs with the court, through its ECF system

---

[8] However, this category does not include any such contacts with clients (any of the ten plaintiffs). Correspondence, including emails and phone calls with clients, are categorized separately, under Client Contact.

**Internal:**      Includes reviewing and paying invoices, calendaring events, internal discussions with and instructions to staff, opening new client matters in the firm's internal billing system, saving documents (such as paystubs and signed representation agreements) into firm's computer server, updating client contact info., organizing attorney's notes, printing docs., etc.

**Research:**      Both legal and non-legal research, to include researching particular individuals

**Strategy/Analysis:** It is unclear what this category means. There are numerous time entries whose described activity is "strategy/analysis."

Consider the time spent by Mr. Ryu and his staff prosecuting (-01047).

| Activity | Atty. Ryu | Paralegal | Sara Ryu | Total |
|---|---|---|---|---|
| **Calculate Atty. Fees** | 3.2 | 0.0 | 0.0 | **3.2** |
| **Calculate Wages Owed** | 10.6 | 60.3 | 0.0 | **70.9** |
| **Client Contact** | 343.9 | 86.0 | 0.0 | **429.9** |
| **Correspondence** | 55.6 | 17.9 | 1.8 | **75.3** |
| **Court Hrngs.** | 28.8 | 0.0 | 0.0 | **28.8** |
| **Depos.** | 135.1 | 0.0 | 0.0 | **135.1** |
| **Depo/Hrng. Prep.** | 225.0 | 0.4 | 0.0 | **225.4** |
| **Doc. Drafting** | 510.5 | 47.0 | 52.5 | **610.0** |
| **Doc. Filing** | 4.0 | 12.1 | 0.0 | **16.1** |
| **Doc. Review** | 84.8 | 5.7 | 1.0 | **91.5** |
| **Internal** | 46.1 | 27.5 | 0.0 | **73.6** |
| **Research** | 32.5 | 2.6 | 5.0 | **40.1** |

| | | | | |
|---|---|---|---|---|
| **Strategy/Analysis** | 84.4 | 0.0 | 1.5 | **85.9** |

(a) **Entire categories of billed time cannot be evaluated for reasonableness due to inadequate descriptions of the time spent, and must therefore be disregarded**

It is questionable whether many of the activities billed by Mr. Ryu and his staff are legitimately billable to his clients—and therefore, to AGAPE, as well. After all, "[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). For example, all of the items under the category of "Internal" should not have been billed.[9] Likewise, items billed under the category of Strategy/Analysis should not have been billed. Indeed, it is not clear what is meant by the time entries under this category. Many of them simply state, "litigation strategy," "settlement strategy," "settlement negotiation strategy build up,"[10] "development of legal theory,"[11] "analysis of facts," "analysis of potential legal

---

[9] **JA785** at Item #: 91, 93, 94, 96, 97, 99, 129, 131, 133, 152, 170, 174, 185, 208, 235, 239, 252, 275, 276, 277, 289, 291, 292, 295, 304, 325, 328, 332, 333, 339, 374, 378, 384, 386, 392, 411, 421, 429, 451, 452, 505, 521-523, 531-533, 539, 554, 584, 601, 613, 668-671, 698, 747, 754, 792, 807, 811, 815, 827, 851-856, 874, 890, 953, 990, 1033, 1037, 1039, 1060-1062, 1065, 1079, 1085, 1086, 1104, 1114, 1121, 1123, 1125, 1159, 1165, 1167, 1220, 1250, 1264, 1268, 1271, 1319, 1344, 1351, 1352, 1362, 1417, 1421, 1509, 1511, 1518-1520, 1522, 1523, 1526-1528, 1541-1544, 1548, 1554, 1574, 1596, 1597, 1600, 1605, 1606, 1614-1618, 1620, 1624, 1626, 1629, 1634-1636, 1649, 1650, 1683, 1686, 1687, 1690, 1695, 1708, 1712, 1716, 1722, 1727-1730, 1763, 1764, 1767, 1769, 1790, 1796, 1848, 1887, 1901, 1904, 1914.

[10] **JA785** at Item #: 832, 838, 858, 914

[11] **JA785** at Item #: 932

theories,"[12] "analysis of the claim," "analysis of the case,"[13] "deliberation for response," etc.[14]  These billing entries appear to be nothing more than documenting time spent thinking about the case.

### (b) Many time entries, even in legitimately billed categories of activities, were inadequately described, and therefore must be disregarded

In addition to entire categories of time-entries which are not compensable—Internal, Filing, Strategy/Analysis, totaling there are many time entries with patently inadequate descriptions of how the time billed was spent, or whose descriptions confirm they should not have been billed to Employees, and therefore not to AGAPE, either.  For example, there are entries that merely state, "discussion of case,"[15] "conference,"[16] "trying to file complaint,"[17] for which Mr. Ryu's paralegal, Cathy Kim, billed 0.8 hours; "attempt to contact district director;"[18] "several attempts to resize Exhibit C in order to submit on ECF and several attempts to figure out how to remove the code from PDF," for which Mr. Ryu's

---

[12] **JA785** at Item #: 1013
[13] **JA785** at Item #: 1036
[14] **JA785** at Item #:  246, 574, 575, 582, 583, 603, 607, 626, 627, 636, 679, 726, 832, 838, 858, 914, 932, 1000, 1004, 1013, 1027, 1036, 1044, 1045, 1050, 1053, 1071, 1073, 1078, 1081, 1088, 1186, 1212, 1213, 1215, 1246, 1247, 1257, 1306, 1380, 1401, 1412, 1438, 1445, 1458, 1465, 1475, 1483, 1486, 1488, 1494, 1496, 1499, 1503, 1514, 1539, 1562, 1607, 1609-1611, 1701, 1703-1705, 1740, 1743, 1772, 1775, 1797, 1812, 1821, 1852, 1853, 1866.
[15] **JA785** at Item #: 93, 96, 99
[16] **JA785** at Item #: 102, 105, 108
[17] **JA785** at Item #: 122
[18] **JA785** at Item #: 237, 238

paralegal billed 0.8 hours,[19] "time proof,"[20] "quotation to the service of process,"[21] "research into what happened,"[22] "[blank],"[23] "notice and motion for . . .,"[24] "litigation planning,"[25] "prepare doc,"[26] "research XXXX,"[27] "witness [and] "witness related activities,"[28] and "attention to" various matters.[29]

In view of the fact that Mr. Ryu's time-entries prolifically include entries under the categories for both (i) review of and (ii) drafting documents, it is reasonable to infer that "attention to" various items involves something other than drafting or reviewing documents. But other than drafting or reading a document, and

---

[19] **JA785** at Item #: 532

[20] **JA785** at Item #: 539

[21] **JA785** at Item #: 1033

[22] **JA785** at Item #: 1076

[23] **JA785** at Item #: 983, 1887 (1.0 hours billed by Mr. Ryu and 0.1 hours billed by Sarah Ryu)

[24] **JA785** at Item #: 1101

[25] **JA785** at Item #: 1186 (for which Mr. Ryu billed 3.6 hours), 1704 (billed 0.5 hours), 1705 (1.5 hours)

[26] **JA785** at Item #: 1602 (for which Mr. Ryu's paralegal billed 2.4 hours), 1608 (for which his paralegal billed 1.9 hours),

[27] **JA785** at Item #: 1603, 1604 (1.7 hours billed by Mr. Ryu)

[28] **JA785** at Item #: 1767, 1769 (3.1 hours billed by Mr. Ryu)

[29] **JA785** "attention to filing of motion," at Item #: 171, 538, "attention to subpoena to the US government for documents," Item #: 195 198, 201, 203, "attention to the conference with DOL," Item #: 241, "attention to service of process," Item # 318, 1039, "attention to the supplemental disclosure," Item #: 426, "attention to deposition scheduling and motions," Item #: 523, "attention to the court's order," Item #: 564, "attention to Rule 11 motion," Item #: 683, "attention to the court's dismissal of Rule 12 motion of the defendants," Item #: 684, "attention to the prior proceeding," Item #: 946, "attention to the difficulty of the service and alternative service," Item #: 1159, "attention to obtaining deposition transcript," Item #: 1554, "attention to settlement conference dates," Item #: 1708.

excluding any research, which falls into its own separate category, what else is there? It appears, once again, that Mr. Ryu simply billed time for thinking about the case.

Other examples of improperly billed tasks abound. For example, there is a time entry of 0.2 hours (12 min.) by Mr. Ryu's paralegal for "looking up [Plaintiff Montgomery's] phone number."[30] Ms. Montgomery had presumably been a client of the firm for some time, as her deposition was conducted on 4/20/21.[31] Yet, a mere ten days later, Mr. Ryu's paralegal billed 0.2 hr. ($36), not to actually speak with Ms. Montgomery or convey information to her through voicemail, but merely to "look up" her phone number.

### (c) Much of the time spent, on activities that were legitimately billable, was excessive

Besides the many time entries whose descriptions are insufficient to permit the evaluation of the reasonableness of the time spent and the fees incurred, there were many tasks for which the time spent was wholly out of proportion to what would have reasonably been required, particularly, with respect to Mr. Ryu, as an attorney with nearly two decades of litigation experience in the employment realm; and with respect to his trained paralegals (Cathy Kim, who has a bachelor's degree and

---

[30] **JA785** at Item #: 792
[31] **JA785** at Item #: 705, 711

has worked for Mr. Ryu for more than ten years, and Sara Ryu—Mr. Ryu's wife, who is a licensed attorney, but not in Virginia).

For example, Mr. Ryu and his paralegal spent a total of 14.9 hours meeting with three Employees prior to filing the complaint,[32] 1.8 hours reviewing documents and calculating the wages owed to each plaintiff,[33] and 3.9 hours drafting the initial complaint.[34]  The most time-consuming portion of that task was presumably the calculation of the unpaid wages.  The 1.5 hours spent by Mr. Ryu performing that task for three Employees was reasonable and illustrates the lack of complexity to this generic FLSA lawsuit.  After all, AGAPE's hourly employees received regular bi-weekly paystubs with the identical format, and containing all relevant information—days worked, hours worked, hourly rate of pay, so that it is easy to identify and digest the salient information from each paystub.[35]

---

[32] **JA785** at Item #: 84-90, 102, 105, 108, 114
[33] **JA785** at Item #: 83, 111, 113, 115, 116
[34] **JA785** at Item #: 109, 110, 112, 118-120, 123, 125, 127
[35] "Pay Rate," which lists the hourly rate of pay for each employee, for each pay-period, as well as "Payroll," which consists of the paystubs for each employee for each bi-weekly pay-period, and which lists the number of hours worked for that pay-period.  From the cross referencing of the "Pay Rate" sheet with its corresponding "Payroll" sheet, the regular hourly rate, number of hours worked during the pay-period, and therefore, number of overtime hours, can easily be ascertained.  Finally, by comparing those calculations with the paystubs for each employee, the unpaid overtime can be readily calculated.

Moreover, the maximum relevant time period for each of the former employees is a three-year look-back period.  However, many of them had not been employed by AGAPE for three years.  For example, Plaintiff SON worked there from 05/16 – 02/18, a period of 22 months.  **(JA58 at ¶ 11)** and Plaintiff CHE worked there from 03/17 – 11/17, a period of about nine months.  **(JA58 at ¶ 19)**. Despite the relative simplicity of calculating each employee's over-time wages, and notwithstanding there were ten plaintiffs at issue, in total, Mr. Ryu and his paralegal spent 70.9 hours calculating the unpaid overtime wages.  That averages out to about 7.1 hours per employee—an inordinate amount of time, particularly for those employees whose tenure was significantly shorter than three years.

Although the calculation of each plaintiff's unpaid wages was straightforward, as demonstrated by the reasonable 1.5 hours of time spent on that task, on behalf of three Employees, *prior to* filing the complaint, the nearly four hours spent drafting an eight-page complaint—a complaint that is likely recycled from a boiler-plate complaint utilized by Mr. Ryu for most of his other FLSA complaints—is excessive and unreasonable.  Essentially, Mr. Ryu spent an average of nearly a half hour per page, despite the generic nature of most of the allegations of fact.  This is at least double the amount of time it should have taken an attorney with nearly two decades of experience drafting such complaints.

33

But it was not only Mr. Ryu whose billing entries reveal a lack of efficiency. Consider the time it took his paralegal to draft the coversheet, summonses, and waivers of service. **(JA64-71)**.  Ms. Kim, who has a bachelor's degree and had been working as Mr. Ryu's paralegal for nearly a decade,[36] and who, presumably, has filled out civil case cover sheets and requests for summonses on numerous occasions, nevertheless billed 2.3 hours doing so.[37]  It would be understandable had it taken 0.3 hours, but the amount of time for this task was inflated by a factor of about 8.

Likewise, consider the time it took Ms. Kim to prepare and transmit the representation agreement and checklist—presumably, standardized boiler-plate documents routinely prepared by Mr. Ryu's firm.  It took her 2.4 hours to complete this task for three plaintiffs.[38]  Similarly, she spent 2.0 hours filing the lawsuit (including 0.8 hours for "[t]rying to file [c]omplaint").[39]  How could it possibly have taken so long to electronically file a complaint—a task which she had presumably done many times previously, during the decade she had worked for Mr. Ryu?

---

[36] **JA289**
[37] **JA785** at Item #: 117, 121
[38] **JA785** at Item No.: 92, 95, 98
[39] **JA785** at Item No.: 122, 124, 126, 128

34

In addition to the substantial time it took for the initial preparation and filing of a very simple, straightforward FLSA complaint, along with its cover sheet and three summonses, and despite Ms. Kim being present for and billing 5.7 hours of time in meetings with Mr. Ryu and his three clients,[40] Mr. Ryu and Ms. Kim billed an additional 1.1 hours for internal discussions related thereto. Considering Ms. Kim's only task was to prepare and file a civil coversheet and three summonses, as well as e-file the complaint and pay the filing fee, tasks with which she was presumably very familiar, there is no legitimate reason why it should have been necessary for Mr. Ryu and Ms. Kim to bill 1.1 hours of time discussing how to perform those mundane, perfunctory tasks?[41]

The rate charged for paralegal Cathy Kim's services ($180/hr.) was reasonable for her work on matters that required the skill and knowledge of a paralegal. But tasks such as preparing documents for mailing, including standard identical representation agreements, and filing pleadings through the ECF—a fairly simple and straight-forward process, should not have required a $180/hr. paralegal to perform. Many of those tasks could have and therefore should have been performed by a secretary or receptionist, and therefore should have been billed at a much lower rate.

---

[40] **JA785** at Item No.: 85, 88, 90
[41] **JA785** at Item No.: 91, 93, 94, 96, 97, 99

With regard to the initial phase of the case—meeting with the clients to understand the relevant factual background, reviewing documents, such as paystubs, calculating damages, and drafting and filing the complaint, there were a number of items billed with inadequate descriptions that make it impossible to ascertain what occurred and therefore, impossible to judge the reasonableness of the time spent.  For example, Mr. Ryu had three billing entries, totaling 0.8 hours, whose descriptions merely stated, "conference."[42]  Were these conferences with the clients, or, based upon the small increments of time, were they more likely internal communications with Mr. Ryu's own staff, adding 0.6 hours to the 1.1 hours already billed for internal communications related to the filing of the initial complaint?

Two days after filing the complaint, Mr. Ryu billed 1.8 hours dedicated to "conference with an attorney" and "research into a lawyer of a potential parallel case."[43]  It is not clear what this means or why it was necessary to devote time to those tasks.  Did Mr. Ryu conference with his wife—an attorney who is not licensed in Virginia?  Or did he conference with some outside counsel, and if so, why?  Presumably he had handled many FLSA cases prior to this one, obviating the need to obtain assistance or advice from some other attorney.

---

[42] **JA785** at Item No.: 102, 105, 108
[43] **JA785** at Item No.: 129-134

Similarly, Sara Ryu billed 5.0 hours at the rate of $420 for "Legal research on retaliation."[44]  However, her time entry indicates the research was actually performed by Manny Ignacio, Esq.—an attorney not associated with Mr. Ryu's law firm.[45]  Why then, was this research billed by Ms. Ryu at her rate?  If the research was outsourced, why was it outsourced?  Did Ms. Ryu add value to Mr. Ignacio's research?  If so, why did she bill it at her rate?  Moreover, Mr. Ignacio's efforts were properly considered as costs, rather than as fees attributable to Ms. Ryu's work.  However, nowhere does this cost appear on Mr. Ryu's billing statement, leading to the conclusion that he paid Mr. Ignacio—presumably, at some discounted rate, and then billed the 5.0 hours of research at his wife's excessive rate (for a Virginia paralegal), despite her having done nothing to add value to Mr. Ignacio's research.

**(d) Duplicative time entries**

Mr. Ryu also appears to have billed multiple times for the same time entry. For example, on 10/29/20, he created three billing entries for reviewing Defendants' Answer.  Each entry was for 0.4 hours, and each was ascribed to a different plaintiff.[46]  Reviewing Defendants' five-page Answer—one page of

---

[44] **JA785** at Item No.: 958
[45] **JA785** at Item No.: 951, 961

[46] **JA785** at Item No.: 141-143

which contained only the jury demand, signature block and certificate of service, and comparing their responses to the corresponding paragraphs of the Complaint was reasonably billed at 0.4 hours. But it was not reasonable to bill three times for the same task, presumably, so that he could be paid for reviewing the Answer on behalf of each of the three plaintiffs he then represented. The appropriate way to handle it would have been to divide the 0.4 hours by three, yielding 0.1 or 0.15 hours per plaintiff, for reviewing Defendants' Answer. Similarly, Mr. Ryu billed three times for "Attention to the update of the status of the service"—once for each Plaintiff.[47] Again, this item was billed three times when it should have been billed only once—if at all.

On 11/4/20, Mr. Ryu drafted an amended complaint. **(JA72)**. The only changes from the originally filed complaint **(JA56)** was the addition of a fourth plaintiff to the caption of the case, and the addition of five paragraphs consisting of one sentence each **(JA75-76 at ¶¶ 23-27)**. Yet, incredibly, Mr. Ryu billed 0.7 hours for this task.[48] Essentially, it took him more than eight minutes to type each sentence. And that is after he spent 1.1 hours speaking with the new (fourth) Employee, Plaintiff CHOI, and reviewing her documents.[49]

---

[47] **JA785** at Item No.: 136-138
[48] **JA785** at Item No.: 147
[49] **JA785** at Item No.: 144, 146

Mr. Ryu also billed multiple times for drafting the virtually identical discovery documents. For example, on 11/5/20, he billed 0.4 hours for drafting requests for admission ("RFAs"), which he billed to Plaintiff SON.[50] But then four days later, on 11/9/20, he entered four additional time entries, each for 0.4 hours, each billed to a different plaintiff, for drafting and serving RFAs.[51] Likewise, on 11/9/20, Mr. Ryu billed each Plaintiff 0.4 hours for drafting and sending interrogatories.[52] The following day, 11/10/20, he billed each Plaintiff 0.4 hours for drafting requests for production of documents ("RPDs").[53]

Mr. Ryu billed twice for drafting a motion to add a new plaintiff (Plaintiff CHOI). On 11/6/20 he billed 0.3 hours to "prepare for motion to add plaintiffs."[54] Four days later, on 11/10/20, he billed 0.7 hours to "draft a motion to add a new plaintiff."[55] In total then, he billed 1.0 hours to draft a consent motion that is barely over one page—two pages if one includes the proposed order and certificate of service.[56] Incredibly, it took paralegal Kim, with the assistance of Mr. Ryu, a

---

[50] **JA785** at Item No.: 149
[51] **JA785** at Item No.: 156, 158, 160, 162
[52] **JA785** at Item No.: 157, 159, 161, 163
[53] **JA785** at Item No.: 164-167
[54] **JA785** at Item No.: 154
[55] **JA785** at Item No.: 168
[56] **JA82, JA84, JA85**

combined 0.9 hours to convert the three documents identified in fn. 56 to pdf and to e-file them[57]—practically as long to draft the documents as to file them!

Similarly, Mr. Ryu billed four times for the same events, with respect to drafting the initial disclosures,[58] "arrang[ing] depositions including objecting to certain interpreters,"[59] and "attention to subpoena to the US government for documents,"[60] He also billed four times for the same task for his review of the Joint Discovery Plan (Dkt. 17)[61] and his "review[ing] the documents with the court filed in a parallel case."[62] It is unclear what that even means. But he billed each plaintiff 0.1 hours for doing so. In fact, he billed five times for "review[ing] produced documents and discovery responses, [etc.]."[63] Mr. Ryu also billed multiple times for other tasks. For example, he billed *eight times* for the same "conference with DOL to locate . . . investigator Bermudez . . . ."[64]—presumably, once for each plaintiff, as he had since filed other FLSA complaints on behalf of other plaintiffs, whose cases were ultimately consolidated with his initially filed complaint. Mr. Ryu billed three times to "review [Defendants'] discovery demand

---

[57] **JA785** at Item No.: 169, 171-173
[58] **JA785** at Item No.: 186-189
[59] **JA785** at Item No.: 191, 194, 197-198
[60] **JA785** at Item No.: 192, 195, 198, 201, 203
[61] **JA785** at Item No.: 175, 177, 179, 181
[62] **JA785** at Item No.: 176, 178, 180, 182
[63] **JA785** at Item No.: 190, 193, 196, 199, 202
[64] **JA785** at Item No.: 217, 219, 221, 225-229

and lodge objections."[65]  He billed three times, for a total of 0.7 hours, for

"*attempt[ing]* to contact the district director,"[66] (emphasis added), a task that likely

should not have been billed at all.  Similarly, he improperly billed for internal

communications with his own support staff.  For example, he billed three times

(for a total of 0.6 hours) for "conf. call with CK and HJ," both of whom are Mr.

Ryu's paralegals.

After subtracting the legal fees generated for activities that should not have

been billed, including those items listed under the "Internal" and "Strategy and

Analysis" categories, as well as the other entries discussed above, and after

eliminating the duplicative entries, it is necessary to further pare down the fees and

costs for those claims and motions that were unsuccessful and contributed nothing

toward settling the case.  Their only function was to dramatically and unnecessarily

inflate the attorney's fees and costs.

Specifically, Mr. Ryu filed two motions for temporary restraining orders and

preliminary injunctions.[67]  (Dkt. 35, 45).  Both motions were denied.[68]  He also

filed a counterclaim to Agape's counterclaim.[69]  A counterclaim to a counterclaim

---

[65] **JA785** at Item No.: 218, 220, 222
[66] **JA785** at Item No.: 232, 237, 238
[67] **JA9 (Dkt. # 35), JA10 (Dkt. # 45)**  (See also, **JA9, JA10 (Dkt. # 35-51)**)
[68] **JA10 (Dkt. # 51)**
[69] **JA12 (Dkt. No. 79, 80, 81)**

41

is not recognized by the law and Mr. Ryu was admonished by the U.S. Bankruptcy

Court for EDVA to the effect that, with that court stating,

> Finally, the Plaintiffs filed a "Counterclaim to the [Defendant's] Counterclaim." . . . A "counterclaim to a counterclaim" is unknown under the Bankruptcy Rules or the Federal Rules of Civil Procedure. [O]ne would think that the Plaintiffs' claims would be encompassed in their Complaint, or in an Amended Complaint). The Court dismissed the Plaintiffs' "Counterclaim to the Counterclaim" on [7/26/21] . . . . The pursuit of all these claims did nothing for the Plaintiffs except to greatly increase the costs of the litigation. **(JA737)**.

Not surprisingly, the trial court granted AGAPE's motion to strike

Employees' counterclaim to AGAPE's counterclaim.[70]

Mr. Ryu filed several retaliation claims against AGAPE,[71] despite none of the

Employees having suffered any adverse action related to the supposed

"retaliation." According to Mr. Ryu, the "retaliation" consisted of Defendant LEE

contacting the aunt of one of the Employees, encouraging her to pressure her niece

to drop her claim against AGAPE. Mr. Ryu also claimed retaliation as a

consequence of a supposed agent of AGAPE calling a plaintiff's current employer

and warning that employer that the plaintiff would sue the new employer under the

FLSA, just as she had sued AGAPE. Again, no adverse consequences occurred as

---

**[70]** **JA12 (Dkt. No. 92)**
**[71]** **JA105, JA114, JA123, JA131, JA146, JA174, JA194, JA219, JA246, JA1007**

a result of the supposed retaliation.  Thus, even if the actions described above could be proven true, plaintiffs sustained no damages therefrom.  Pursuit of the retaliation claims therefore did nothing but unnecessarily drive up legal fees.

Presumably, in furtherance of chasing the retaliation red herring, Mr. Ryu and his staff spent considerable time attempting to obtain call records from Verizon to confirm the identity of whomever supposedly placed the phone call to one of the plaintiff's new employer, and to the aunt of another plaintiff.  Those tasks were also a waste of time and contributed nothing toward advancing the FLSA claims toward resolution.  Indeed, the FLSA claims were the only meritorious claims asserted by any of the plaintiffs.  In total, the hours spent on tasks that should not have been billed total 154.6 for Mr. Ryu,[72] 11.9 for Sara Ryu,[73] and 21.4 for Mr. Ryu's paralegals.[74]

---

[72] **JA785** at Item No.: 237, 238, 503, 505, 569, 570, 571, 574-579, 581, 582, 591, 592, 593, 595, 598, 604, 608, 617, 619, 622-627, 633, 635-637, 650, 652-654, 656-660, 663, 672-674, 717, 719-722, 726-729, 740-744, 746, 750, 752, 758, 763, 767-770, 772, 773, 782, 786, 800, 804, 825, 859, 869, 870, 871, 873, 901, 903, 908, 920, 923, 927, 950, 955, 959-964, 966, 969, 971-973, 994, 998, 1000, 1002-1004, 1010, 1012, 1013, 1015-1017, 1026-1030, 1032, 1035, 1037, 1038, 1041, 1042, 1050, 1075-1078, 1094, 1096, 1097, 1099, 1101, 1110, 1111, 1120, 1143-1146, 1175, 1178, 1182, 1188, 1191-1193, 1198, 1203, 1207, 1210-1212, 1218, 1226, 1228, 1245, 1247, 1248, 1257, 1258, 1348, 1494, 1549, 1550, 1557, 1558, 1593, 1638, 1654, 1732, 1887

[73] **JA785** at Item No.: 736, 872, 958, 965, 1095, 1202

[74] **JA785** at Item No.: 122, 148, 151, 572, 573, 580, 583-586, 594, 596, 597, 601, 602, 605, 620, 638-642, 655, 661, 662, 664-666, 723, 759-762, 787, 788, 805, 806, 822, 823, 922, 925, 929, 930, 952, 954, 956, 1011, 1059, 1068, 1069, 1079, 1102,

It is important to note that expenses—nearly $40,000—are partly attributable to unsuccessful claims.  For example, filing fees for several unsuccessful retaliation complaints.  Likewise fees for service of process, court reporter and transcript fees for depositions taken in those cases, costs pursuing the Verizon subpoenas, etc.  Upon remand for a re-hearing on the issue of attorneys' fees and costs, the parties can argue that point.

As to the unsuccessful retaliation complaints, it is no answer that those claims were never litigated and therefore cannot be deemed "unsuccessful," any more than a nonsuited case in state court, pursuant to VA. CODE ANN. § 8.01-380, would be considered "unsuccessful."  There are two key differences.  First, unlike a nonsuited action, Employees' retaliation claims have been dismissed with prejudice.  Second, as a matter of law, Employees' retaliation claims could not have succeeded.

Although not necessarily frivolous, because assuming the truth of the factual allegations, which the trial court must do when adjudicating a motion to dismiss, the conduct alleged, at least in theory, could potentially support a retaliation claim.  But under the circumstances of those Employees who raised those claims, there were simply no compensable damages because no harm accrued to any of those

---

1103, 1106-1108, 1121, 1122, 1148, 1149, 1151, 1153, 1156, 1169, 1170, 1224, 1225, 1259-1261, 1264-1268, 1312, 1347

former Agape employees.  None was fired, demoted, or sustained any pecuniary losses.  Therefore, the retaliation complaints were ill-advised.

Even assuming the conduct at issue had a sufficient nexus with AGAPE that it would be reasonable to impute the conduct to them, and even if the conduct alleged could, in theory, support a claim for retaliation, none of the Employees suffered any actual damages.  And without actual damages there could be no punitive damages.  Moreover, the FLSA, under which Plaintiffs' actions arose, does not provide for punitive damages, from which it follows, even had any Employees sustained actual pecuniary losses (as opposed to merely emotional distress), punitive damages would still not have been an available remedy.

It should also be mentioned that even had Employees' retaliation claims had legal and factual merit, their attempt to file them as a counterclaim to a counterclaim was procedurally improper.  And with nearly two decades of experience under his belt, and with a previous ruling by a judge in one of Mr. Ryu's other FLSA cases, Mr. Ryu should have known that to be the case. Likewise, Mr. Ryu's efforts to obtain injunctive relief (TRO) against AGAPE, in order to limit their free speech, particularly, when their legal remedy—*i.e.*, an FLSA retaliation claim—is available and adequate, was similarly misguided.

Mr. Ryu's shots in the dark, consisting in his filing a counterclaim to a counterclaim; filing FLSA retaliation lawsuits on behalf of several Employees

despite the absence of any pecuniary or objectively quantifiable damages suffered by any of them; seeking punitive damages in an FLSA case; and seeking a TRO to restrict AGAPE's free speech, collectively raise doubts about his judgment as to how to efficiently and productively litigate FLSA cases. While not denying he obtained satisfactory results for Employees, it was a long and unnecessarily circuitous route.

Next, it is necessary to reduce the hours by any overt duplication of effort. As explained, *supra*., at pp. 37-41, many billing entries were simply duplicated so that each plaintiff would be billed for the same task. It was simply a method by which to improperly inflate the fees. There are two aspects to this determination. First, given Mr. Ryu's nearly two decades of experience litigating cases in general, and FLSA cases, in particular—and his demand for an hourly rate commensurate with that experience; and given the ten-year tenure of his paralegal, who, presumably, has assisted with these cases before, and who is very familiar with Mr. Ryu's intra-office procedures and technology, were the hours expended reasonable? The following is a chart of time-entries that are duplicative on their face.

| **Entry** | **Duplicative** | **Time Eliminated** | | **TimeKeeper** |
|---|---|---|---|---|
| 92 | 95, 98 | 1.6 | | Paralegal |
| 109 | 110, 112 | | 1.4 | M. Ryu |
| 118 | 119, 120 | | 0.4 | M. Ryu |
| 123 | 125, 127 | | 0.8 | M. Ryu |
| 124 | 126, 128 | 0.8 | | Paralegal |
| 130 | 132, 134 | | 0.6 | M. Ryu |
| 136 | 137, 138 | | 0.2 | M. Ryu |
| 139 | 140 | 0.1 | | Paralegal |
| 141 | 142, 143 | | 0.8 | M. Ryu |
| 149 | 156, 158, 160, 162 | | 1.6 | M. Ryu |
| 157 | 159, 161, 163 | | 1.2 | M. Ryu |
| 164 | 165, 166, 167 | | 1.2 | M. Ryu |
| 175 | 177, 179, 181 | | 0.3 | M. Ryu |
| 176 | 178, 180, 182 | | 0.3 | M. Ryu |
| 186 | 187, 188, 189 | | 0.3 | M. Ryu |
| 190 | 193, 196, 199, 202 | | 0.4 | M. Ryu |
| 191 | 194, 197, 200 | | 0.3 | M. Ryu |
| 192 | 195, 198, 201, 203 | | 0.4 | M. Ryu |
| 213 | 216 | 0.1 | | Paralegal |
| 217 | 219, 221, 225-229 | | 0.7 | M. Ryu |
| 218 | 220, 222 | | 0.4 | M. Ryu |
| 249 | 250 | 0.2 | | Paralegal |
| **TOTAL** | | | **11.3** | **M. Ryu** |
| | | **2.8** | | **Paralegal** |

The remaining step prior to calculating the lodestar amount is to evaluate the reasonableness of the fees incurred for the various activities. After eliminating duplicative time entries, entries on unsuccessful claims or motions, and time entries for inappropriately billed (or insufficiently explained) activities, such as "strategy and analysis" or the many strictly internal matters like paying invoices to court reporters, that are not reasonably billed at a paralegal rate—if at all, it is

47

important to recognize that many of the billable activities not yet scrutinized were attributable to those unsuccessful claims, and other matters not reasonably billed. It should be inferred that a significant percentage of the client contacts—meetings, phone calls, emails, etc. were also attributable to the superfluous billable hours that were eliminated.  Likewise, the correspondence hours; the depo/hrng. preparation, client contacts, hours, court hearings, depositions, and drafting of documents should also be attributed to those surplus hours, which thereby further reduces the compensable hours.

After making those preliminary adjustments to the numbers of hours billed, it is now appropriate to consider the reasonableness of the adjusted numbers. Returning to the chart on pg., Mr. Ryu and his staff spent 70.9 hours calculating the ten Employees' lost wages.  That equates to roughly one full work-day for each Employee.  16.1 hours were spent e-filing documents—the equivalent of an employee spending two full work-days doing nothing but e-filing.  Based on those numbers alone, it seems that the number of hours billed should be further reduced by a factor of at least two—if not three.

In total, Mr. Ryu billed 243.8 hours at $480/hour that were attributable to unsuccessful claims and motions.  He billed 8.6 additional unnecessary hours at $510/hour.  His wife, Sarah Ryu, billed 20.6 hours at $420/hour that were likewise

unnecessary because they did nothing to advance the Plaintiffs' position.  Finally, Mr. Ryu's paralegal, Cathy Kim, billed 28.1 unnecessary hours at $180/hour.

## VI.    Conclusion

In view of the factors discussed herein, including the many unsuccessful claims, the duplicative and superfluous billing, etc., it is clear the trial court failed to adequately articulate and therefore failed to properly consider the factors bearing upon an award of attorney's fees and costs.

WHEREFORE, Appellants, AGAPE, *et. al.*, respectfully move this Honorable Court to vacate the trial court's awards of attorney's fees and costs, and remand the case for a new hearing on that issue, with direction to the trial court to articulate the legal and factual bases for its decision.

Respectfully submitted,

AGAPE HEALTH MANAGEMENT, INC., *et. al.*

by Counsel

*/s/ Phillip B. Leiser, Esq.*
THE LEISER LAW FIRM, PLLC
By:  Phillip B. Leiser, Esq.
1749 Old Meadow Road, Suite 630
Tysons Corner, Virginia 22102
TEL: (703) 734-5000, ext. 101
FAX: (703) 734-6000
pbleiser@leiserlaw.com
VASB # 41032
*Counsel for Appellants*

49

## Certificate of Compliance

1. The foregoing brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14 point.

2. Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, the foregoing brief contains 11,597 words.

3. I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief with the word or line printout.

*/s/ Phillip B. Leiser, Esq.*
Phillip B. Leiser, Esq.